# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

CHARLEE SCHROEDER
1084 85th Avenue
Amery, WI 54001

CHEYANNE SCHROEDER
808 W. State Street
Mauston, WI 53948

ESTATE OF PETER SCHROEDER
c/o LARENE DIORIO
808 W. State Street
Mauston, WI 53948

       *Plaintiffs*,

      *vs.*

JUNEAU COUNTY
c/o County Clerk, Terri Treptow
220 E. State Street
Courthouse Rm 112
Mauston, WI 53948

COLLEEN BEIER
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

SHERIFF ANDREW ZOBAL
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

TEIG HOAG
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

MATTHEW BOURGEOIS
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

DANIEL WOOTEN
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

PHILIP E. PUENT
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

MITCHELL SCHLICHTING
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

DANIEL HEIMANN
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

KELSEY HAGEMES
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

TANYA SWINEHART
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

JOHN DOE OFFICERS
Juneau County Justice Center
200 Oak St.,
Mauston, WI 53948

*Defendants.*

---

**NOW COMES** the above-named plaintiffs, Estate of Peter Schroeder, Chance Schroeder, Charlee Schroeder, and Cheyanne Schroeder, by their attorneys, Martin Law Office, S.C., and as and for their claims for relief against the above-named defendant, alleged and show to the Court as follows:

2

## Jurisdiction and Venue

1.      This is a civil action, pursuant to 42 U.S.C. § 1983, and under the laws of Wisconsin, for redress of the deprivation, under color of law, of the rights of the plaintiffs.

2.      This civil action is also brought under the laws of the State of Wisconsin for redress of the personal injuries and damages sustained by Peter Schroeder, Chance Schroeder, Charlee Schroeder, and Cheyanne Schroeder.

3.      This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and its supplemental jurisdiction under 28 U.S.C. § 1367.

4.      Venue in the Western District of Wisconsin is proper under 28 U.S.C. 1391(b) due to the location of the defendants and the incidents, as alleged herein.

## Parties

5.      The plaintiff, Charlee Schroeder is currently an adult resident of the State of Wisconsin. Charlee Schroeder is the son of Peter Schroeder. Charlee Schroeder was a minor at the time of the subject incident and death of Peter Schroeder.

6.      The plaintiff, Cheyanne Schroeder, is a minor child and is a resident of the State of Wisconsin. Cheyanne Schroeder resides with Larene Diorio, her legal guardian and Peter's mother. Cheyenne is the daughter of Peter Schroeder.

7.      Peter Schroeder was an adult resident of the State of Wisconsin, residing at 808 W. State Street, Mauston, WI 53948. Peter Schroeder died on October 30, 2023 as a result of the incident complained of herein. The plaintiff, the Estate of Peter Schroeder appears by and through the Special Administrator, Larene Diorio.

8.      Chance Schroeder was the adult child of Peter Schroeder. Per Wis. Stat. § 893.80, a notice of claim was served to notify Juneau County of Chance Schroeder's wrongful death claims arising out of the death of Peter Schroeder. Pursuant to Wis. Stat. § 803.03(4), the plaintiffs provide the following reasons for why Chance Schroeder is not currently joined in this action: Chance Schroeder died on November 15, 2024, following the death of Peter Schroeder.

9.      At all times hereto, the defendant, Juneau County, is a municipal corporation organized under the laws of the State of Wisconsin with offices at 220 E. State Street, Mauston, Wisconsin 53948. Juneau County Sheriff's Office ("JCSO") is an agency of Juneau County. Juneau County is responsible for creating and implementing JCSO's policies and practices. Juneau County is responsible for hiring, training, supervision, and discipline of sheriff's deputies employed with JCSO, including the defendants.

10.     Defendant, Colleen Beier ("Beier") was at all material times employed by JCSO as the Jail Captain and assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948. Defendant Beier was a final decisionmaker for Juneau County as to the Juneau County Jail and was responsible for the supervision, policies, and operations of the jail and for the actions of the correctional officers under her command.

11.     Defendant, Sheriff Andrew Zobal ('Zobal"), is the duly elected Sheriff of Juneau County, Wisconsin, and at all times relevant hereto was acting under color of state law and within the scope of his employment with Juneau County. Zobal's business address is at 200 Oak Street, Mauston, Wisconsin 53948.

12.     Defendant, Teig Hoag, ("Hoag") was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a lieutenant, with supervisory responsibilities of other officers and

employees, assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

13.     Defendant, Matthew Bourgeois, ("Bourgeois") was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a lieutenant, with supervisory responsibilities of other officers and employees, assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

14.     Defendant, Daniel Wooten ("Wooten") was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a deputy assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

15.     Defendant, Philip E. Puent ("Puent") was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a deputy assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

16.     Defendant, Mitchell Schlichting ("Schlichting") was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a deputy assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

17.     Defendant, Daniel Heimann ("Heimann"), was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a deputy assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

18.     Defendant, Kelsey Hagames ("Hagames") was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a deputy assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

19.     Defendant, Tanya Swinehart ("Swinehart"), was, at all times material hereto, an employee, agent, and/or representative of the JCSO, acting within the course and scope of their employment and under the color of law as a nurse assigned to the Juneau County Jail, located at 200 Oak Street, Mauston, Wisconsin 53948.

20.     Defendants, "John Doe Officers", is the designation for any other employee and/or agent of Juneau County, whose name, identity, or involvement in the subject incident is not currently known to the plaintiffs, including a deputy with the possible last name of "McCumber," as referenced herein.

## GENERAL ALLEGATIONS

21.     All acts of the defendants, as alleged herein, were performed within the usual policies, practices, and/or customs of Juneau County.

22.     Peter Schroeder was arrested on October 26, 2023, by the City of Mauston Police Department in a state of severe emotional distress and suicidality.

23.     At the request of his mother, Larene Diorio, the City of Mauston Police Department brought Peter Schroeder to Juneau County Jail because of the jail's familiarity with Peter Schroeder's mental health issues and prior suicidality.

24.     While in custody at the Juneau County Jail, Peter Schroeder committed suicide by hanging on October 30, 2023.

25.    The Juneau County Jail is operated by the Juneau County Sheriff's Office, under the authority of Sheriff Andrew Zobal, and Jail Administrator Captain Colleen Beier. Upon information and belief, Captain Colleen Beier and Sheriff Zobal are final policymakers and decisionmakers with respect to the administration of the Juneau County Jail.

26.    Suicide is the leading cause of deaths in jail, which was known to all defendants at the time of Schroeder's incarceration.

27.    A risk of suicide is considered a serious medical need and a substantial risk of serious harm to the suicidal inmate.

28.    Both Wis. Admin. Code, § DOC 350.17, and the standard of practice for suicide prevention for jails, require facilities to have policies and procedures relating to the supervision and housing of inmates that are at risk of seriously injuring themselves, including the following components:

(1)    Obtaining documented information from the arresting or transporting agency to assess an inmate's potential for suicide or self-harm.

(2)    Intake screening of inmates that includes interview items and staff observation related to potential suicide risk.

(3)    Procedure for placement of an inmate on suicide watch. Policies and procedures relating to the procedure for placing an inmate on suicide watch shall include all of the following components:

(a)    Immediate notification to designated supervisory staff if an inmate is identified as a suicide risk.

(b)    Designation of housing areas and security precautions for inmates who are placed on suicide watch.

(c)    Description of monitoring procedures for inmates on suicide watch, including frequency and documentation of wellness checks.

(4)    Identification of trained persons who may assess an inmate's level of suicide risk.

(5)    Notification to qualified mental health professionals within 12 hours of placement of a potentially suicidal inmate on suicide watch. Assessment by a qualified mental health professional shall be completed as soon as practicable.

(6)    Identification of qualified mental health professionals who are authorized to remove an inmate from a suicide watch status after an on-site face-to-face assessment.

(7)    Frequency of communication between health care and jail personnel regarding the status of an inmate who is on suicide watch.

(8)    Intervention protocol during an apparent suicide attempt, including life-sustaining measures.

7

(9)     Identification of persons to be notified in case of attempted or completed suicides.

(10)   Documentation of actions and decisions regarding inmates who are suicide risks, including all of the following:

    (a)     Individual initiating the suicide watch.

    (b)     Date and time watch was initiated.

    (c)     Reason watch was initiated.

    (d)     Name of supervisor contacted.

    (e)     Date and time supervisor contacted.

    (f)     Name, date, and time of referral to mental health professional.

    (g)    Written documentation from the mental health professional removing an inmate from a suicide watch including name, date, and time.

(11)   Implementation of 2 hours of annual documented staff training regarding suicide prevention and identification of risk factors.

(12)   Access by staff to debriefing and support services.

(13)   Implementation of an operational review following a suicide or significant suicide attempt.

29.     In addition, jails are required to provide well-being checks of all inmates and are required to have policies and procedures that ensure all inmates are personally observed by jail security staff at staggered intervals, that do not exceed 15 minutes for inmates on suicide watch and 60 minutes for all other inmates.

30.     Juneau County Jail's written policies required 30-minute checks for all inmates not on suicide watch.

31.     Video observation is a supplement to personal observation, and cannot be used in place of personal observation by individual officers.

32.     Every personal observation must be documented.

33.     Jails are required to ensure that staff receive adequate training regarding suicide prevention and identification of risk factors.

34.     All staff involved in inmate supervision are required to be trained in the implementation of a suicide prevention program, including identification and supervision of suicidal inmates and the implementation of suicide watch.

35.     Staff were required to be trained to recognize that various risk factors in assessing risk of suicide, including mental illness, suicidal statements, substance abuse, history of trauma, history of prior suicidal statements, history of prior suicidal attempts, requests for help, verbal cues (such as expressing a desire to die), suicidal planning, self-harm, triggering events (including problems in familial relationships) demographics, criminal history, emotional changes (such as sadness, crying, mood swings), and behavioral changes.

36.     When an inmate presents as a high risk of suicide, including through statements of active suicide ideation, suicide protocol must be initiated and the inmate must be evaluated by mental health staff.

37.     Juneau County was required to use screening forms that include interview items and staff observations related to potential suicide risk.

38.     Upon his arrest, Schroeder was booked in the Juneau County Jail on October 26, 2023.

39.     A suicide screening was performed at Schroeder's arrival on October 26, 2023. Schroeder informed Deputy Skiles that he had been receiving mental health services but failed to identify Schroeder as being at risk of self-harm.

40.      No follow-up suicide screening was performed after the initial booking.

41.     Schroeder was known to the defendants because he had been incarcerated at Juneau County Jail on numerous prior occasions.

42.     Schroeder was known to have multiple mental illnesses, including bipolar disorder, ADHD, anxiety, depression, and history of substance abuse.

43.     Schroeder's history of suicidality was also known to each of the defendants, including his prior suicidal attempts, prior suicidal statements, past incidents of planning and

9

preparatory acts, history of impulsiveness, and his history of receiving mental health treatment through Juneau County for his suicidality.

44.    In light of his known mental illness, known suicidality, prior attempts, and recent incarceration, Schroeder was at high risk for self-harm upon admission to the jail; therefore, immediate initiation of suicide precautions was warranted upon his admission to the Juneau County Jail.

45.    However, no suicide precautions were ever initiated for Mr. Schroeder.

46.    During his incarcerations, the defendants became aware that Mr. Schroeder was suicidal.

47.    On October 28, 2023, Schroeder's cellmates alerted staff that he had made several suicidal comments in their presence.

48.    Deputy Hagames notified deputies McCumber and Schlichting about Schroeder's suicidal statements.

49.    Hagames listened to Schroeder's recorded phone calls during which she confirmed he told his partner that he was going to kill himself by hanging himself.

50.    Despite learning of Schroeder's suicidality, Deputy Hagames did not contact mental health crisis or put Schroeder on suicide protocol.

51.    In response to these confirmed suicidal threats, deputies McCumber and Schlichting took Schroeder to booking.

52.    Once they became aware of Schroeder's suicidal threats and suicidality, the defendants were required to place Schroeder on suicide watch and to document the suicidal threats.

53.     Instead, upon learning of Schroeder's suicidal comments, Lieutenant Bourgeois ordered that Schroeder to the booking area on October 28, 2023, without starting suicide protocols or ordering that a crisis evaluation be done.

54.     It is policy, practice, and/or custom of the Juneau County Jail to house suicidal inmates in the booking area.

55.     Juneau County Jail's written policy is to contact Innervisions Counseling for after hours suicide risk; however, Innervisions Counseling was not contacted by any defendants.

56.     Captain Beier, in her capacity as final policymaker, also ordered that Schroeder was moved to the booking area because of the suicidal statements so that he could be evaluated.

57.     Despite recognizing the need for a mental health evaluation, no evaluation was ever done.

58.     Despite not putting Schroeder on suicide watch, the defendants issued Schroeder a suicide blanket in recognition of his risk of suicide.

59.     Instead of initiating suicide protocol, staff were instructed to keep Schroeder in the booking area so staff could observe him.

60.     Juneau County Jail does not have policies, procedures, or training regarding close observation watch.

61.     In declining to initiate suicide protocol, the defendants attempted to avoid the strict requirements that would have been triggered by Schroeder on suicide protocol, including the need to conduct and document 15-minute checks, and the need to obtain mental health treatment for Schroeder.

62.     The jail does not have any policies, procedures, or training regarding observation of suicidal inmates that are not placed on formal suicide watch and the staff were not directed by Captain Beier as to how frequently Schroeder needed to be observed.

63.     On October 29, 2023, Schroeder was agitated and crying in his cell.

64.     Lieutenant Hoag was aware that Schroeder was placed in booking due to suicidal comments and heard Schroeder yelling in his cell. Lieutenant Hoag instructed that Schroeder be kept in booking due to his behavior but did not contact crisis.

65.     That same day, Schroeder told Deputies Heimann that he wanted to end his life, that his family did not love him, that his life was meaningless, that his life was not worth living, and that he would be better off dead.

66.     Schroeder said that he needed help because he was going to "blow his brains out" when he was released or he would walk into traffic to end his life.

67.     Schroeder asked Deputy Heimann to assist him in getting an emergency Chapter 51 mental health commitment because he was worried about killing himself.

68.     Deputy Heimann declined, telling Schroeder that he would not assist in getting Schroeder a mental health commitment and that, instead, the jail would keep him safe, even though no suicide protocol was started and no mental health screening had been requested.

69.     Heimann determined that an inmate making similar statements would not have passed a suicide assessment.

70.     Heimann informed Lieutenant Hoag of his conversation with Schroeder and was advised to put Schroeder in a suicide smock, not to start suicide protocols, and to keep Schroeder in the booking area for monitoring.

71.    The defendants, including Captain Beier, were aware of Schroeder's suicidal statements and request for mental health services.

72.    Despite knowledge of Schroeder's continued suicidality and requests for help, no suicide assessment was performed, crisis was not contacted, mental health services were not obtained, and suicide watch was not initiated by any staff or supervisor.

73.    All defendants understood that, by not initiating suicide watch, the defendants were not required to place Schroeder on fifteen-minute checks or to document checks.

74.    The policy, practice, and/or custom of the Juneau County Jail is to perform inmate checks by security video, not personal observation.

75.    Suicidality constitutes a serious medical need.

76.    All staff have the obligation to intervene when they recognize that an inmate is not receiving adequate care for a serious medical need, including suicidality.

77.    On October 30, 2023, Heimann spoke with Captain Beier about Schroeder's request for mental health treatment, which Captain Beier declined.

78.    Deputies Heimann and Puent made the decision to move Schroeder to cell 1577, which had been formerly used by the jail as a group booking cell.

79.    At all times material hereto, all defendants were aware of Schroeder's suicidality and that he had been placed in Cell 1577 while suicidal.

80.    Cell 1577 was situated in the jail's booking area

81.    As part of its original design as a group booking cell, it contained a telephone that was mounted to the wall, with a 17.5-inch braided metal cord and grab bars.

82.     The braided cord connecting the handset to the wall-mounted base was of sufficient length and strength for an adult male to easily use as a ligature point, and posed an open and obvious risk to suicidal inmates.

83.     The cell also had numerous blind spots, where inmates were obscured from security video and sight lines to officers in the booking area.

84.     The telephone was installed in a blind spot.

85.     Prior to Schroeder's death, Juneau County, at the direction of the jail's final policymakers, repurposed the group booking cell to house inmates with medical needs and suicidal inmates, such as Mr. Schroeder.

86.     The cell, including the placement of a wall-mounted ligature point was not designed with the purpose of safely housing suicidal inmates.

87.     The defendants were all aware of the blind spots and the open and obvious danger posed to suicidal inmates, by the presence of the wall-mounted phone and braided metal cord.

88.     In repurposing the group holding cell for suicidal inmates, Juneau County did not remove the open and obvious ligature point and did not address the security blind spot in the area of the wall-mounted telephone.

89.     The cells adjacent to 1577 in the booking area were also designated for inmates on suicide watch, and, at the time, housed one or multiple other suicidal inmates, including an inmate with the initials "JS."

90.     On October 30, 2023, two crisis workers from the Department of Health Services (DHS) were present to evaluate one of the other inmates in the adjacent cells.

91.     Despite the presence of DHS crisis staff, the defendants did not inform DHS crisis staff of Schroeder's suicidal comments.

92.     On October 30, 2023, Deputies Wooten and Puent were assigned to the booking area.

93.     Upon information and belief, on October 30, 2023, at 12:31 pm, Officer Daniel Wooten performed checks on the other cell(s) housing suicidal inmates in the booking area.

94.     At 12:32 pm, Officer Daniel Wooten returned to Schroeder's cell door to remove items and a tray that Schroeder handed him; Wooten then returned to have a 37 second conversation with Schroeder before closing the cell door at 12:33:05.

95.     Schroeder was sitting at a bench next to the wall-mounted phone.

96.     At 12:33:47, Schroeder stood and looked out of the window of his cell door.

97.     At 12:38:01, seeing no one around, Schroeder walked to the phone, picked up the handset with his left hand, wrapped the cord around his neck, and then sat back on the bench.

98.     Schroeder continued to practice manipulating the phone cord around his neck but did not yet attempt to hang himself.

99.     At 12:51:11, Deputy Wooten can be seen in the booking area from Schroeder's cell, but he does not look into Schroeder's cell to observe him.

100.    At 12:52:01, Deputy Wooten left the booking area.

101.    At 12:52:33, Schroeder stood up, went to his cell door, and looked into the booking area.

102.    At 12:52:46, Schroeder returned to the phone and reached over his head with his left arm, re-wrapped the cord around his neck, and began to hang himself.

103.    At 12:54:04, Deputy Wooten returned to his desk in the booking area but did get up to walk to the cells to perform a personal observation of Schroeder or the other suicidal inmate(s).

104.    Deputy Wooten left the booking area and returned to his desk multiple times but never walked past Schroeder's cell or TS's adjacent cell to look into either suicidal inmate's cells.

105.    Deputy Wooten falsely documented performing observations of TS at 12:54 and 13:25.

106.    Had Deputy Wooten performed required observations of TS, let alone Schroeder, Deputy Wooten would have discovered Schroeder in time to prevent his death.

107.    During this time Deputy Philip E. Puent was not in the booking area and was passing medications to inmates in other parts of the jail.

108.    Deputy Puent arrived in the booking area at 13:33:17 (4 minutes after Schroeder began to hang himself, and 1 hour and 9 minutes after Schroeder had been last observed).

109.    Deputy Puent was not in the booking area for the purpose of performing a suicidal person observation of Schroeder or any other inmate in the booking area.

110.    Puent's body camera shows that no other staff were in the booking area.

111.    Puent did not immediately notice Schroeder hanging in his cell.

112.    After passing medications to the other suicidal inmate(s), at 1:42:18 pm, Deputy Philip E. Puent finally discovered Schroeder hanging in the cell (49 minutes after Schroeder began to hang himself, and 1 hour and 9 minutes after Schroeder was last observed).

113.    Upon the discovery of Schroeder's hanging body, Puent called for a crash cart and life-saving measures were undertaken by Deputy Dickrell.

114.    Mauston Area EMS responded to the scene and continued life-saving measures, which ultimately failed.

115.    The Juneau County Medical Examiner's Office soon arrived and Schroeder was pronounced dead on October 30, 2023.

116.    Schroeder's body remained on the floor of the booking room, just outside his cell, for over an hour as the incident was investigated.

117.    Body camera footage from Deputy Dickrell shows Juneau County staff, milling around Schroeder's dead body, joking about body bags, laughing about getting the message that an inmate was hanging, and commenting that they would not stay late at work because of Schroeder's suicide.

118.    Deputy Dickrell's body camera footage captured staff acknowledging that an "actual psych" unit for suicidal inmates "would be nice," and that "you would think" the jail administration would have "planned this out better."

119.    In Officer Dickrell's body camera, immediately following Schroeder's death, officers acknowledged Schroeder's suicidal statements and that Schroeder had been incarcerated multiple times with suicidal ideation.

120.    Nurse Swinehart started her shift at the Juneau County Jail on October 30, 2023. Swinehart knew, from her conversations with Captain Beier, about Schroeder's suicidal comments, that a mental health screen had not been performed, that Schroeder was not on suicide watch, and that Schroeder was being held alone in the group booking cell; despite her knowledge of these serious risks, Nurse Swinehart did not initiate a mental health screen or suicide protocols.

121.    Prior to Schroeder's death, on the afternoon on October 30, 2023, Deputy Wooten was doing rounds and felt that something was wrong with Schroeder. Deputy Wooten was aware of Schroeder's multiple suicidal statements in the preceding days. Despite his concern, nothing

was reported, no screen was performed, suicide watch was not started, and Schroeder was still kept alone in the group booking cell with the wall-mounted phone.

122.    Schroeder's death was, at all times, preventable had the defendants acted reasonably and/or not disregarded the substantial and serious risk of harm to Schroeder, including performing a mental health screen, obtaining an evaluation by a mental health provider, assisting Schroeder with his requested mental health commitment, performing required observation of Schroeder, and not actively increasing the risk of suicide by placing Schroeder alone in a cell with blind spots and an obvious ligature point.

123.    Following the incident, Lieutenant Hoag told investigating officers that the lack of suicide prevention undertaken in Schroeder's case was within the normal process of Juneau County.

124.    According to Lieutenant Hoag, Juneau County will only implement suicide watch for inmates that failed the intake screen or that are "actively attempting" suicide.

125.    The plaintiffs, Cheyanne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship, and economic support, due to the death of their father.

126.    Schroeder suffered personal injuries, including, but not limited to severe pain, suffering, emotional distress, mental anguish, and economic damages, for which the Estate of Peter Schroeder is entitled to recover.

**COUNT I:**
**42 U.S.C. § 1983 CLAIM**
**VIOLATION OF FOURTEENTH AMENDMENT**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

127.    The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

128.    Schroeder was in custody following an arrest for which he had not been convicted; therefore, Schroeder had the right to be free of excessive force and unreasonable conduct of prison officials and punishment, as a pre-trial detainee, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

129.    Further, Schroeder was a qualified individual with disabilities, including serious mental illness and known suicidality, and had the right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

130.    Each of the named defendants were acting under color of state law and within the scope of their employment with Juneau County.

131.    Prior to and during Schroeders incarceration, Schroeder exhibited a known, obvious, and serious risk of suicide.

132.    All defendants individually and collectively knew of the facts demonstrating Schroeder's suicidality and substantial risk of serious harm or death, including, but not limited to, suicidal ideation, suicidal threats, suicidal planning, mental illness, intrusive and depressive thoughts, hopelessness, mood lability, behavioral changes, requests for mental health care intervention, substance abuse potential for substance withdrawal, history of suicidal ideation, history of suicidal threats, history of suicidal attempts, history of suicidal planning, history of mental illness, as well as factors that increased the likelihood that Schroeder would attempt suicide, including, but not limited to, that Schroeder was placed in a room alone, without any

19

guards or cellmates, with a wall-mounted telephone and limited sight lines, that Schroeder was not on suicide protocol or watch, that Schroeder was not being personally observed, that Schroeder had not been evaluated by a medical or mental health professional for suicide risk, and that Schroeder was denied his request to seek mental health intervention, including Chapter 51 confinement.

133.    Each of the defendants were aware that Schroeder's suicide risk created a serious medical need.

134.    Each of the defendants were aware that the group booking cell was not designed to hold suicidal inmates; that the cell was not modified after it was recommissioned to hold suicidal inmates; that the cell contained an obvious, known, and readily accessible ligature point (the braided metal telephone cord), and, that the cell contained security blind spots that prevented adequate personal observation, specifically in the area of the ligature point.

135.    Each of the defendants, acting under color of state law, were deliberately indifferent to Schroeder's serious medical need and substantial risk of serious harm, in consciously failing to take any reasonable measures to abate the risk, including, failing to adequately screen Schroeder for suicide risk upon admission; failing to re-screen Schroeder after suicidal threats were discovered; failing to treat Schroeder's numerous suicidal threats seriously; disregarding Schroeder's history of suicidal threats, ideation, planning and attempts; disregarding Schroeder's mental health; failing to have Schroeder evaluated by a medical or mental health professional; failing to report Schroeder's suicidal comments to a medical or mental health professional; refusing to place Schroeder on suicide watch or protocol, thereby consciously denying adequately frequent personal observations; disregarding the requirement to perform reasonably frequent personal observations, including the 15-minute observation requirement for

suicidal inmates and the 60-minute observation requirement for all inmates, thereby leaving Schroeder and the other two inmates unobserved for a continuous period of longer than one hour; not ensuring that staff remained present in the booking area, despite using the booking area to house multiple suicidal inmates; consciously leaving Schroeder isolated and out of view from all staff and other inmates; placing Schroeder in a room with a wall-mounted telephone with a cord of sufficient length and tensile strength for Schroeder to commit suicide by hanging; placing Schroeder in a room with inadequate sight lines to officers and security cameras; keeping the wall-mounted telephone affixed despite recommissioning the cell to house suicidal inmates despite the obvious substantial risk of serious harm posed by the ligature point; having inadequate sight lines to the ligature point that created a blind spot in the area where suicide was most foreseeable; otherwise consciously disregarding and increasing Schroeder's known substantial risk of suicide.

136.    Each of the defendants, acting under color of state law, were deliberately indifferent to Schroeder's serious medical need and substantial risk of serious harm, and, in addition to failing to abate Schroeder's risk of suicide, acted in such a manner as to increase Schroeder's likelihood of suicide and that defendants' conduct was a proximate cause of Schroeder's suicide insofar as the defendants knew Schroeder threatened suicide by hanging; refused his request for mental health care; placed Schroeder into a holding cell with an open and obvious ligature and stepped away for over an hour, thereby affirmatively giving Schroeder the instrumentality and opportunity for his threatened suicide that he otherwise lacked prior to these affirmative acts.

137.    Each of the defendants, acting under color of state law, intentionally and with deliberate indifference, treated Schroeder differently than similarly situated inmates without

21

disabilities, including by failing to initiate suicide precautions, failing to provide appropriate and safe housing, failing to provide required monitoring, and failing to provide mental health services.

138.    The defendants' differential treatment of Schroeder was based on his mental illness and suicidality, and was not justified by any legitimate purpose.

139.    The acts and omissions of the defendants, as alleged herein, violated Schroeder's right to due process and to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

140.    The intentional, reckless, and conscious indifference by the individual defendants directly caused severe injury and death to Schroeder.

141.    As a direct and proximate result of the acts and omissions of the defendants, Peter Schroeder suffered death and the Estate of Peter Schroeder suffered damages, including pre-death pain, suffering, emotional distress, mental anguish, loss of enjoyment of life, and economic damages.

142.    As a further direct and proximate result of the acts and omissions of the defendants, the plaintiffs Cheyenne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship, loss of family integrity, and loss of economic support due to the death of their father.

**COUNT II:**
**42 U.S.C. § 1983 CLAIM**
**VIOLATION OF EIGHTH AMENDMENT**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

143.    The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

144.    Schroeder was on extended supervision at the time of his arrest and, upon information and belief, was in custody, in part, for violating the terms of his extended supervision; therefore, Schroeder had the right to be free of cruel and unusual punishment, which includes the right to adequate medical care, under the Eighth Amendment.

145.    Each of the named defendants were acting under color of state law and within the scope of their employment with Juneau County.

146.    Prior to and during Schroeder's incarceration, Schroeder exhibited a known, obvious, and serious risk of suicide.

147.    All defendants individually and collectively knew of the facts demonstrating Schroeder's suicidality and substantial risk of serious harm or death, including, but not limited to, suicidal ideation, suicidal threats, suicidal planning, mental illness, intrusive and depressive thoughts, hopelessness, mood lability, behavioral changes, requests for mental health care intervention, substance abuse potential for substance withdrawal, history of suicidal ideation, history of suicidal threats, history of suicidal attempts, history of suicidal planning, history of mental illness, as well as factors that increased the likelihood that Schroeder would attempt suicide, including, but not limited to, that Schroeder was placed in a room alone, without any guards or cellmates, with a wall-mounted telephone and limited sight lines, that Schroeder was not on suicide protocol or watch, that Schroeder was not being personally observed, that Schroeder had not been evaluated by a medical or mental health professional for suicide risk, and that Schroeder was denied his request to seek mental health intervention, including Chapter 51 confinement.

148.    Each of the defendants were aware that Schroeder's suicide risk created a serious medical need.

149.     Each of the defendants were aware that the group booking cell was not designed to hold suicidal inmates; that the cell was not modified after it was recommissioned to hold suicidal inmates; that the cell contained an obvious, known, and readily accessible ligature point (the braided metal telephone cord), and that the cell contained security blind spots that prevented adequate personal observation, specifically in the area of the ligature point.

150.     Each of the defendants, acting under color of state law, were deliberately indifferent to Schroeder's serious medical need and substantial risk of serious harm, in consciously failing to take any reasonable measures to abate the risk, including, failing to adequately screen Schroeder for suicide risk upon admission; failing to re-screen Schroeder after suicidal threats were discovered; failing to treat Schroeder's numerous suicidal threats seriously; disregarding Schroeder's history of suicidal threats, ideation, planning and attempts; disregarding Schroeder's mental health; failing to have Schroeder evaluated by a medical or mental health professional; failing to report Schroeder's suicidal comments to a medical or mental health professional; refusing to place Schroeder on suicide watch or protocol, thereby consciously denying adequately frequent personal observations; disregarding the requirement to perform reasonably frequent personal observations, including the 15-minute observation requirement for suicidal inmates and the 60-minute observation requirement for all inmates, thereby leaving Schroeder and the other two inmates unobserved for a continuous period of longer than one hour; not ensuring that staff remained present in the booking area, despite using the booking area to house multiple suicidal inmates; consciously leaving Schroeder isolated and out of view from all staff and other inmates; placing Schroeder in a room with a wall-mounted telephone with a cord of sufficient length and tensile strength for Schroeder to commit suicide by hanging; placing Schroeder in a room with inadequate sight lines to officers and security cameras; keeping the

wall-mounted telephone affixed despite recommissioning the cell to house suicidal inmates despite the obvious substantial risk of serious harm posed by the ligature point; having inadequate sight lines to the ligature point that created a blind spot in the area where suicide was most foreseeable; otherwise consciously disregarding and increasing Schroeder's known substantial risk of suicide.

151.    Each of the defendants, acting under color of state law, were deliberately indifferent to Schroeder's serious medical need and substantial risk of serious harm, and, in addition to failing to abate Schroeder's risk of suicide, acted in such a manner as to increase Schroeder's likelihood of suicide and that defendants' conduct was a proximate cause of Schroeder's suicide insofar as the defendants knew Schroeder threatened suicide by hanging; refused his request for mental health care; placed Schroeder into a holding cell with an open and obvious ligature and stepped away for over an hour, thereby affirmatively giving Schroeder the instrumentality and opportunity for his threatened suicide that he otherwise lacked prior to these affirmative acts.

152.    The intentional, reckless, and conscious indifference by the individual defendants directly caused Schroeder's death.

153.    The acts of the defendants violated Schroeders' constitutional right to be free from cruel and unusual punishment and his right to adequate medical care for his serious medical condition and high risk of suicide.

154.    As a direct and proximate result of the acts and omissions of the defendants, Peter Schroeder suffered death and the Estate of Peter Schroeder suffered damages, including pre-death pain, suffering, emotional distress, mental anguish, loss of enjoyment of life, and economic damages.

155.    As a further direct and proximate result of the acts and omissions of the defendants, the plaintiffs Cheyenne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship and economic support due to the death of their father.

**COUNT III:**
**42 U.S.C. § 1983 CLAIM**
**FAILURE TO INTERVENE**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

156.    The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

157.    This claim is brought pursuant to 42 U.S.C. § 1983 against the individual defendants for failure to intervene to prevent the violation of Schroeder's Federal and Constitutional rights, as more fully alleged above.

158.    In the manner alleged above, during the constitutional violations described, one or more of the individual defendants named in this claim, and other as-yet unknown individuals, stood by without intervening to prevent the misconduct, despite having opportunity to do so.

159.    In not intervening, each defendant acted intentionally and with malice and was deliberately indifferent to Schroeder's constitutional rights.

160.    Schroeder's constitutional rights were violated as a proximate cause of the defendants' failure to intervene.

161.    As a direct and proximate result of the acts and omissions of the defendants, Peter Schroeder suffered death and the Estate of Peter Schroeder suffered damages, including pre-death pain, suffering, emotional distress, mental anguish, loss of enjoyment of life, and economic damages.

162.   As a further direct and proximate result of the acts and omissions of the defendants, the plaintiffs Cheyenne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship and economic support due to the death of their father.

**COUNT IV:**
**42 U.S.C. § 1983 CLAIM**
**CIVIL RIGHTS CONSPIRACY**
**AGAINST ALL INDIVIDUAL DEFENDANTS**

163.   The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

164.   This Count IV is brought pursuant to 42 U.S.C. § 1983 against all individual defendants for conspiracy to violate Schroeder's rights under the Fourteenth and/or Eighth Amendments to the United States Constitution as more fully alleged above.

165.   As alleged above, the individual defendants, acting under color of law, reached a mutual understanding and agreement to deprive Peter Schroeder of his constitutional rights by failing to initiate suicide watch protocols, failing to provide mental health intervention, and concealing or disregarding the risks and dangers of housing him in Cell 1577 with an obvious ligature point and inadequate monitoring.

166.   In furtherance of this agreement, the defendants acted in concert and engaged in overt acts, including: refusing Schroeder's request for emergency mental health commitment; failing to initiate suicide protocols despite repeated suicidal statements; placing Schroeder in a cell with an obvious ligature point; and disregarding suicide prevention standards and policies.

167.   As a direct and proximate result of the acts and omissions of the defendants, Peter Schroeder suffered death and the Estate of Peter Schroeder suffered damages, including pre-

death pain, suffering, emotional distress, mental anguish, loss of enjoyment of life, and economic damages.

168.   As a further direct and proximate result of the acts and omissions of the defendants, the plaintiffs Cheyenne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship and economic support due to the death of their father.

**COUNT V:**
**42 U.S.C. § 1983 CLAIM**
*MONELL CLAIM*
**AGAINST JUNEAU COUNTY, CAPTAIN BEIER, AND SHERIFF ZOBAL**

169.   The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

170.   This count is brought against Juneau County, pursuant to 42 U.S.C. § 1983 insofar as the acts and omissions of the individual defendants, and other as-yet unknown individuals, were taken pursuant to one or more express or *de facto* policies, practices and/or customs of Juneau County.

171.   Each individual defendant acted under color of state law in their official capacity as employees of Juneau County.

172.   The violation of Schroeder's constitutional rights, as alleged herein, was caused by the official policies, widespread customs, and/or grossly deficient training practices of Juneau County, acting through its final policymakers, including Sheriff Zobal and Jail Administrator, Captain Beier.

173.   The unconstitutional conduct in this matter, as alleged above, and expressly incorporated herein, was pursuant to official policy, widespread custom and practice, and/or decisions of a final policymaker for Juneau County and the Juneau County Jail, including, the

practice and decision to repurpose the group booking cell to isolate suicidal inmates despite the open and obvious ligature point and insufficient sight lines; failure to provide adequate care and housing for suicidal inmates; denying suicide protocols to Mr. Schroeder and/or other suicidal inmates, including required monitoring, mental health assessment, mental health treatment, documentation, and other care by recategorizing the need for supervision as "close monitoring" to avoid the legal requirements that are implicated by placing an inmate on suicide watch; creating a "close monitoring" category of supervision and not providing any guidelines, requirements, policies or training to its officers in implementing "close monitoring"; denying Mr. Schroeder and/or other suicidal inmates sufficient frequent personal observation; denying Mr. Schroeder and/or other suicidal inmates mental health care; denying Mr. Schroeder' request for mental health referral or commitment; and otherwise directed the actions of the individual officers in this case.

174.    Juneau County, through its final policymakers, was aware that the unconstitutional conduct, as alleged herein, was widespread, persistent, and well-settled custom, even if this conduct was not formalized in written policies and procedures.

175.    Juneau County, through its final policymakers, had actual or constructive knowledge of these widespread practices and customs and was deliberately indifferent to the existence and foreseeable violation of constitutional rights of suicidal inmates, including Schroeder.

176.    The unconstitutional conduct in this case, as alleged above, was also the result of Juneau County's gross failure to train its officers as to suicide screening, suicide prevention, suicide protocols, inmate safety, inmate medical needs, housing suicidal inmates, and monitoring of suicidal inmates.

177. Juneau County, through its final policymakers, including Sheriff Zobal and Jail Administrator, Captain Beier, was aware that the unconstitutional conduct, as alleged herein, was widespread, persistent, and well-settled custom, even if conduct was not formalized in written policies and procedures.

178. Juneau County, through its final policymakers, including Sheriff Zobal and Jail Administrator, Captain Beier, had actual or constructive knowledge of these widespread practices and customs and was deliberately indifferent to the existence and foreseeable violation of constitutional rights of suicidal inmates, including Schroeder.

179. Juneau County, Sheriff Zobal and Jail Administrator, Captain Beier, failed to adequately supervise or train its employees, including the individual defendants, despite knowledge of the unconstitutional conduct and likelihood that the conduct would result in the violation of Schroeder's constitutional rights.

180. The failure to train and supervise its employees as to suicide screening, suicide prevention, suicide protocols, inmate safety, inmate medical needs, housing suicidal inmates, and monitoring of suicidal inmates, amounts to deliberate indifference to the rights of Schroeder and the rights of other suicidal inmates.

181. Upon information and belief, Juneau County, Sheriff Zobal and Jail Administrator, Captain Beier had notice of the need for training and/or the need for training was obvious and the likelihood of a constitutional violation was high, such that the failure to train constitutes deliberate indifference.

182. The acts of Juneau County, by and through its final policymakers, including Sheriff Zobal and Jail Administrator, Captain Beier, was the moving force and direct cause of the violation of Schroeder's constitutional rights.

183.    As a direct and proximate result of the acts and omissions of the defendants, Peter Schroeder suffered death and the Estate of Peter Schroeder suffered damages, including pre-death pain, suffering, emotional distress, mental anguish, loss of enjoyment of life, and economic damages.

184.    As a further direct and proximate result of the acts and omissions of the defendants, the plaintiffs Cheyenne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship and economic support due to the death of their father.

**COUNT VI:**
**STATE LAW CLAIM**
**NEGLIGENCE**
**AGAINST INDIVIDUAL DEFENDANTS**

185.    The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

186.    The individual defendants had a duty to act with due care, as jail and medical staff, and acted negligently, jointly and severally, in breach of the duty of care to Schroeder in committing the conduct alleged in Counts I, II, and III, above, including, failing to take any reasonable measures to abate Schroeder's risk of suicide, including, failing to adequately screen Schroeder for suicide risk upon admission; failing to re-screen Schroeder after suicidal threats were discovered; failing to treat Schroeder's numerous suicidal threats seriously; disregarding Schroeder's history of suicidal threats, ideation, planning and attempts; disregarding Schroeder's mental health; failing to have Schroeder evaluated by a medical or mental health professional; failing to report Schroeder's suicidal comments to a medical or mental health professional; refusing to place Schroeder on suicide watch or protocol, thereby consciously denying adequately frequent personal observations; disregarding the requirement to perform reasonably

frequent personal observations, including the 15-minute observation requirement for suicidal inmates and the 60-minute observation requirement for all inmates, thereby leaving Schroeder and the other two inmates unobserved for a continuous period of longer than one hour; not ensuring that staff remained present in the booking area, despite using the booking area to house multiple suicidal inmates; consciously leaving Schroeder isolated and out of view from all staff and other inmates; placing Schroeder in a room with a wall-mounted telephone with a cord of sufficient length and tensile strength for Schroeder to commit suicide by hanging; placing Schroeder in a room with inadequate sight lines to officers and security cameras; keeping the wall-mounted telephone affixed despite recommissioning the cell to house suicidal inmates despite the obvious substantial risk of serious harm posed by the ligature point; having inadequate sight lines to the ligature point that created a blind spot in the area where suicide was most foreseeable; otherwise consciously disregarding and increasing Schroeder's known substantial risk of suicide.

187.    The defendants' negligent acts, as alleged, were in violation of ministerial duties created by DOC regulations, policies and procedures of Juneau County, policies and procedures of the Department of Corrections, and due to Schroeder's high risk of suicide, which constituted a known danger.

188.    As alleged, the defendants breached their ministerial duties by acting negligently.

189.    The negligence of the defendants was a proximate and direct cause of Schroeder's death.

190.    The plaintiffs, Cheyanne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship, and economic support, due to the death of their father, and the violation of his rights, as alleged herein.

32

191.    The Estate of Peter Schroeder suffered compensatory damages, including pre-death pain, suffering, emotional distress, mental anguish, loss of liberty, loss of enjoyment of life, loss of dignity, and economic damages as a result of the violation of his rights.

**COUNT VII:**
**STATE LAW CLAIM**
**NEGLIGENT HIRING, TRAINING, and SUPERVISION**
**AGAINST JUNEAU COUNTY**

192.    The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs

193.    As alleged herein, Juneau County and its final policymakers, Captain Beier and Sheriff Zobal, were negligent in hiring, training and/or supervising its staff.

194.    As a result of the negligent hiring, training and supervision by the defendants, Juneau County, by and through its employees committed a wrongful act, including, but not limited to those listed in the preceding claims and allegations.

195.    That the negligent hiring, training and supervision was a cause of the death and damages sustained by Schroeder as alleged herein, including pre-death pain, suffering, emotional distress, mental anguish, loss of liberty, loss of enjoyment of life, loss of dignity, and economic damages as a result of the violation of his rights

196.    As a result of the negligent hiring, training, and supervision by these defendants, as alleged, the plaintiffs, Cheyanne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship, and economic support, due to the death of their father, and the violation of his rights, as alleged herein.

**COUNT VIII:**
**STATE LAW CLAIM**
**WIS. STAT. § 101.11 SAFE PLACE CLAIM**
**AGAINST JUNEAU COUNTY**

197.    The plaintiffs reallege and incorporate by reference the allegations of each of the preceding paragraphs.

198.    At all times, Juneau County was an owner and employer of a public building, and was obligated to exercise due care for the safety of frequenters and/or invitees on said property, including Schroeder; that at all times material hereto, including on October 30, 2023, Juneau County, its agents, servants, and/or employees, breached its duty of care and was negligent in that it, amongst other things, failed to maintain, operate, repair, maintain and construct the premises, specifically with regard to the repurposing of the group booking cell to house suicidal inmates without removal of an open and obvious ligature point, and was otherwise negligent.

199.    As alleged, the defendants breached their ministerial duties by acting negligently in light of known structural defects and known unsafe conditions.

200.    The negligence of the defendants was a proximate and direct cause of Schroeder's death.

201.    The plaintiffs, Cheyanne, Chance, and Charlee Schroeder suffered wrongful death damages including loss of society and companionship, and economic support, due to the death of their father, and the violation of his rights, as alleged herein.

202.    The Estate of Peter Schroeder suffered compensatory damages, including pre-death pain, suffering, emotional distress, mental anguish, loss of liberty, loss of enjoyment of life, loss of dignity, and economic damages because of the violation of his rights.

**WHEREFORE, the plaintiffs demand a jury trial in this matter, and judgment against the defendants as follows:**

34

A.    For an order declaring that the defendants violated Schroeder's constitutional rights;

B.    For compensatory damages against all defendants, jointly and severally, in an amount to be determined at trial;

C.    For punitive damages in an amount to be determined at trial;

D.    For injunctive relief requiring Juneau County to adhere to adequate suicide prevention requirements;

E.    For plaintiffs' attorneys' fees and costs awardable by law, including, 42 U.S.C. § 1988; and

F.    For such further and additional relief as this Court may deem equitable and just.


Dated: October 16,2025                **MARTIN LAW OFFICE, S.C.**
                                      Attorney for Plaintiff(s)

                                      *Electronically Signed by Drew J. DeVinney*

                                      _____
                                      Drew J. De Vinney
                                      State Bar No. 01088576
                                      Frankie J. Ovando
                                      State Bar No. 01116037

ADDRESS
7801 S. Howell Avenue, Ste.102
Oak Creek, WI 53154
414-856-2310 (office)
414-856-2315 (fax)
drew@martin-law-office.com